R. A. McCormick v. Commissioner.
McCormick v. Commissioner
Docket No. 35064.
United States Tax Court
1953 Tax Ct. Memo LEXIS 296; 12 T.C.M. (CCH) 410; T.C.M. (RIA) 53130; April 16, 1953
*296 Community property. - Petitioner was manager of the Omaha, Nebraska, branch of the National Cash Register Co. He was employed under a contract which provided he receive a fixed salary plus 50 per cent of the net profits of the office. Petitioner received a payment on his share of the net profits after the effective date of the Nebraska community property law, September 7, 1947, and contends the entire amount received was community property. Held, petitioner's share of the profits earned before the date of the Nebraska community property law is his separate property even though he did not receive payment for his share until after the effective date. Harry L. Welch, Esq., for the petitioner. Mark Townsend, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined a deficiency in petitioner's income tax for the year 1947 of $4,753.37. The only issue for decision is whether that part of the payment of 50 per cent of the profits of a business received by petitioner on December 10, 1947, subsequent to the effective date of the Nebraska community property law, was community property or separate property. The petitioner proportioned his income from the National Cash Register Co. as follows on his 1947 income tax return: Fixed salary
$ 4,100.00
Payments under profit sharing
agreement: Received in February
7,106.09
Received in July
7,151.00
Total
$18,357.09
Community property: Fixed salary
$ 1,950.00
Payment under profit sharing
agreement: Received in December
22,956.00
Total community property
income
$24,906.00 The respondent's "Explanation *298 of Adjustments" on the deficiency notice was as follows: "(a) It is held that, of $43,263.09 received by you during 1947 as compensation for services, $33,711.86 was your separate income and $9,551.23 was community income taxable one-half to you and one-half to your wife, Mrs. Frances B. McCormick. Your contention that the entire amount of $22,956.00 received by you in December of 1947 was community income is denied." In respondent's brief his proportionment of the National Cash Register Co. income has been changed, and the payment received in December. He contends that the $22,956 payment should be proportioned between separate income of $13,370.67 and community income of $9,585.33. The total separate income is: Fixed salary
$ 4,100.00
Payments under profit
sharing agreement: Received in February
$ 7,106.09
Received in July
7,151.00
Portion of December
Payment
13,370.67
27,627.76
$31,727.76
In the stipulation of facts petitioner conceded that he is not entitled to a deduction of $192 representing dues paid to a social club and claimed as a business expense. The parties also stipulated that the remaining business expenses and automobile depreciation *299 of $3,944.90 should be allocated between petitioner and his wife in the same proportion as income received in 1947 from the National Cash Register Co. is allocated between petitioner and his wife. Findings of Fact The stipulation of facts is incorporated herein by reference. Petitioner is an individual residing in Omaha, Nebraska. He filed his income tax return for the calendar year 1947 on the cash receipts and disbursements basis with the collector of internal revenue for the district of Nebraska. Petitioner is now, and was in 1947, manager of the Omaha, Nebraska, branch of the National Cash Register Co. On October 5, 1942, petitioner entered into a contract of employment with the National Cash Register Co. This contract was amended on May 8, 1945, and was in full force and effect during 1947. Pertinent provisions of the contract are as follows: "4. COMPENSATION. "You are to receive a salary of Seventy-five and 00/100 ($75.00) Dollars per week, and 50 (%) per cent of the net profits earned by the Agency while under your supervision as Agency Manager, such profits to be determined after crediting all income incident to the operation of the Agency, and after deducting all *300 costs and expenses incident to such operation, including your own salary and an adequate reserve for charge-back of commissions on cancelled customers' accounts. Such reserve, to be determined by the Company, will be a percentage of the commission interest in the unpaid balances of customers' accounts as of December 31st of each year or any other closing period that might be considered proper by the Company, and as the date of the termination of this contract. The method of setting up such reserve and the maintenance of it will be outlined in the Company's current 'Agency Office Manual,' which outline is made a part hereof as if fully incorporated herein. "During the term of your employment hereunder your proportion of the net profits is to be paid as soon after December 31st of each year, or any other closing period decided upon, as it is convenient for the Company to close the books for that accounting period. "If your employment as Agency Manager in the present Agency is terminated at a time other than the end of an accounting period, you shall share only in the net profits that are earned during that accounting period to the date of the termination of such employment, and your *301 proportion of such net profits is to be paid as soon after such date of termination as the profits for such period can be determined. "Commission will not be considered as earned, so far as profits are concerned, until the order has been accepted by the Company, full settlement as defined in the Company's current 'Price List' has been received, and the product sold has been shipped or delivered. "After the termination of your employment as Manager in your present Branch, either by cancellation, resignation or transfer to another Branch, seventy-five per cent (75%) of any prospective commissions outstanding at the time of such termination will be credited to a liquidating account in your name and the remaining twenty-five per cent (25%) will be credited to the operation under the new Branch Manager; such credits to be made when the commission is earned as defined in the contract. "In the event of the cancellation of a customer's account upon which such prospective commission was so split, commission on the unpaid balance of such account will be charged back seventy-five per cent (75%) to your liquidating account and twenty-five (25%) to the operation under the new Branch Manager. *302 "In the event of the cancellation of a customer's account on which full commission was credited to your operation before the termination of your employment, full commission on the unpaid balance of such account will be charged back to your liquidating account. "Your interest in such liquidating account and the reserve provided for above shall be the same percentage as provided in your contract as your share of the net profit. "If your employment as Manager is terminated, and the operation was at a loss, such loss shall be set-off against such liquidating account and the reserve provided for above, in accordance with the provisions of your present contract. "If you are transferred as Manager from one Branch to another after June 30 of any year, if such new operation for the balance of that calendar year shows a net loss, such loss will be carried over into the next full calendar year accounting period, of the Branch in which such loss was incurred. "If you are transferred from one Branch to another and the operation in the Branch from which you are transferred shows a net profit, such profit shall be handled separate and apart from the profit or loss of the Branch to which *303 you are transferred. "Payments will be made to you from time to time on your portion of the liquidating account and reserve, as the customers' accounts are liquidated, in any amount in excess of what the Company deems necessary to protect it against charge back of commissions on cancelled customers' accounts. "This cancels and replaces Rider of May 8, 1945 (letter form) relative to prospective commissions." Pursuant to this contract petitioner performed services as manager of the branch office. These services included supervising 23 or 25 employees, as well as calling on customers and personally selling equipment. During the year 1947 petitioner received compensation from National Cash Register Co. as follows: Fixed salary (received monthly)
$ 6,050.00
Payments under profit sharing
agreement: Received in February
7,106.09
Received in July
7,151.00
Received in December
22,956.00 The payment of $7,106.09 in February 1947 represents the final settlement of petitioner's share of the 1946 earnings of the Omaha branch office. The payment of $7,151 received in July 1947 represents one-half of petitioner's share of the earnings of the branch office for the *304 period January 1 to May 29, 1947. The payment of $22,956 received on December 10, 1947, includes the other half of his share of the earnings of the branch office for the period January 1 to May 29, 1947, and the remainder of the payment represents his share of the profits for the period May 29 through October 30, 1947. For the period January 1, 1947 to September 6, 1947, the accumulated net earnings of the Omaha branch office and petitioner's share of the net earnings and salary were as follows: Branch office net earnings
$41,043.50
Petitioner's share of net earnings
20,521.75
Petitioner's share of salary
4,100.00
The following figures represent the net earnings of the Omaha branch office and the computation of the branch manager's profit. The payments made to petitioner in July and December are based on these figures: Branch Office Net Profits
Petitioner's Share of Profits
1947
Accumulated
By Period
Accumulated
By Period
January 1 to January 30
$ 1,726.93
$ 1,726.93
$ 863.47
$ 863.47
February 27
2,466.63
739.70
1,233.32
369.85
March 27
6,171.44
3,704.81
3,085.72
1,852.40
May 1
11,938.48
5,767.05
5,969.24
2,883.52
May 29
28,603.34
16,664.86
14,301.67
8,332.43
June 26
33,995.62
5,392.28
16,997.81
2,696.14
July 31
31,973.50
(2,022.12)
15,986.75
(1,011.06)
August 28
36,668.10
4,694.60
18,334.05
2,347.30
September 25
50,280.34
13,612.24
25,140.17
6,806.12
October 30
60,214.15
9,933.81
30,107.08
4,966.91
November 27
67,229.08
7,014.93
33,614.54
3,507.46
December 31
77,901.20
10,672.12
38,950.60
5,336.06
*305 For the period August 29, 1947 to September 6, 1947, inclusive, the net earnings of the Omaha branch office and the computation of the branch manager's profit were as follows: Branch office net profits
$4,375.40
Petitioner's share of profits
2,187.70
The Nebraska community property law, which became effective September 7, 1947, provides, among other things, as follows: "Section 1. All property of the husband, both real and personal, owned or claimed by him before marriage or before the effective date of this act, whichever is later, and that acquired afterwards by gift, devise, or descent, or received as compensation for personal injuries, shall be his separate property. * * *
"Sec. 3. All property acquired by either the husband or wife during marriage and after the effective date of this act, except that which is the separate property of either as hereinabove defined, shall be deemed the community or common property of the husband and wife, and each shall be vested with an undivided one half interest therein; * * *." Petitioner's salary from the National Cash Register Co. for the year 1947, totaling $43,263.09, should be allocated as follows: Separate property
$31,727.84
Community property
11,535.25
*306 Opinion Petitioner was employed under a contract which provided that he receive 50 per cent of the net profits of the Omaha branch office of the National Cash Register Co. as well as a regular salary for his services as manager of the branch. Petitioner received a payment on his share of the profits after the effective date, September 7, 1947, of the Nebraska community property law. He contends that since the payment was received after the effective date it is community property. His argument centers on the meaning of the word "acquired" as used in the community property law of Nebraska and he cites numerous cases defining "acquired." These cases do not involve Nebraska litigants. The word "acquired" was discussed in great detail in , affd. , and also in , affd. . Those cases involved the Texas community property law. The Texas statute read: "All property acquired by either husband or wife during marriage, except that which is the separate property of either, shall be deemed the common property of the husband and wife * * *." Petitioner *307 contends that the King and Wrightsman decisions must be limited to cases arising under the Texas statute. We do not agree. The reasoning in those cases is applicable to the present situation. This Court recently decided the case of Harry B. Sidles, 19 T.C. - (No. 128, March 24, 1953), which involved the Nebraska community property law. We decided in that case that the determination of the issue as to when property is acquired turned upon the date when the initial right to receive the property was acquired. See McKay Community Property, 2 ed., section 535, p. 361, where it is stated: " § 535. The effect of conditions and their performance. - When a contract containing conditions is closed before marriage, and the conditions are performed during marriage by the community, some confusion has arisen in the authorities, due to the mistaken view taken by some courts that in such cases the property is acquired not through the separate antenuptial contract, but through the performance of the conditions during marriage. If the contract is largely executory and the conditions and stipulations of the contract are burdensome, and are performed by the community, it may seem to some like a legal *308 nicety devoid of substantial justice to refer the origin of the property to the date of closing the contract through which it was acquired; but generally justice is better subserved by the rule now firmly established that property acquired by contract is deemed to have its origin as of the date of the contract. "And it is not difficult to find a justification for the rule: The contract itself is property, and having been acquired before marriage it is separate by force of the plain terms of the statute. If it should be sold without performance of the conditions clearly the proceeds of the sale would be separate, and if the conditions are performed after marriage through the expenditure of separate funds no one would insist that the property is common. The community may be reimbursed for its funds used to perform the conditions and when this is done even and exact justice is done to all; the separate estate obtains the advantages of its separate contract, or suffers the disadvantages of any, and the community is reimbursed for its outlay. If the circumstances impose no obligation to make reimbursement, this should not change the rule just stated." It is our interpretation of the *309 contract that petitioner became entitled to his share of the profits as the sales were made by the branch office. The section of the contract referring to the charging of expenses of running the Omaha branch and the requirement of a reserve for chargebacks arising from cancellations and repossessions were merely for bookkeeping purposes. These computations did not affect the right which vested in petitioner as he made sales of National Cash Register Co. products. This case is substantially the same as the Wrightsman case wherein the petitioner received a payment of salary after moving to a community property state. The court stated: "The resolution in the instant case did not create the right to the salary. That right accrued as the services were rendered, upon an implied contract that the services would be paid for at what they were reasonably worth, depending upon the earnings of the company." In this case, the computation did not create the right to petitioner's share of the profits. The right to the share of the profits vested as the services were rendered. This case is also comparable to the King case wherein petitioner, who was an attorney, entered into a contract to prosecute *310 a law suit while he was married. Payment of the fee was not made until some two years subsequent to the death of his wife. The court there held that the right had its inception during the existence of the community and the fact that the fee was paid when petitioner was a widower did not change the nature of the fee from community property to separate property. There does not appear to be any contract basis upon which petitioner could be divested of his earnings once they became vested. Petitioner argues that the setting up of a reserve for collection from the customers prevented the vesting of his profits. We can not agree. The right to the compensation is the determining factor, and the vesting of that right did not depend upon the final computation of profits. We, therefore, hold that petitioner's right became vested as profits were earned. That portion of petitioner's share of the profits which was earned prior to September 7, 1947, was his separate property and taxable as such, and that portion earned subsequent to said date was the community property of petitioner and his wife. Petitioner's income should be apportioned in accordance with *311 our findings. Decision will be entered under Rule 50.